## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ALEJANDRO MORENO, | ) | No. 15 C 11168 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Magistrate Judge Sidney I. Schenkier |
| NANCY A. BERRYHILL, Acting | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER[2]

Plaintiff Alejandro Moreno ("claimant" or "Mr. Moreno") has moved for summary judgment seeking reversal or remand of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") (doc. # 16: Pl.'s Mem. in Support of Sum. J.). The Commissioner has filed her own motion seeking affirmance of the decision denying benefits (doc. # 23: Def.'s Mot. for Sum. J.). For the following reasons, Mr. Moreno's motion for remand is denied and the Commissioner's motion is granted.

### I.

On March 30, 2007, Mr. Moreno filed a claim for DIB and SSI, alleging that he became disabled on February 16, 2006, when he fell off a scaffold at work (R. 150, 336). After his claim was initially denied, he participated in a hearing on December 12, 2009; the Administrative Law Judge ("ALJ") denied benefits and the Appeals Council affirmed the denial on January 10, 2011

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Acting Commissioner of Social Security Nancy A. Berryhill as the named defendant.

[2] On December 21, 2015, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. # 6).

(R. 1-3, 18-39). Claimant filed a complaint in the district court and the Commissioner agreed to a voluntary remand; the case was remanded to a new ALJ for further proceedings to reassess the claimant's mental impairment in accordance with the special technique at 20 CFR 404.1520a and 416.920a,[3] as well as to reevaluate claimant's residual functional capacity ("RFC") and the opinions of his treating doctors (R. 810, 989).[4] A new ALJ held a hearing on February 5, 2014, at which claimant (represented by counsel), a vocational expert ("VE"), a medical expert, and claimant's wife all testified (R. 863). On June 17, 2014, the ALJ ruled that claimant was not disabled, and the Appeals Council upheld the ALJ's determination, making it the final opinion of the Commission (R. 790-93). *See* 20 C.F.R. § 404.981; *Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

Mr. Moreno contends that he is unable to work because of both physical and mental impairments: various problems related to pain in his lower back, legs and elsewhere, high blood pressure, and depression that is a direct result of his ongoing chronic pain (R. 180, 243). Mr.

---

[3] The special technique requires the ALJ to first determine whether a claimant has a medically determinable mental impairment(s) by evaluating the claimant's "pertinent symptoms, signs, and laboratory findings." § 404.1520a(b)(1). *Id.* If the claimant has a medically determinable mental impairment, the ALJ must document that finding and rate the degree of function limitation in four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. § 404.1520a(c)(3); *Craft v. Astrue,* 539 F.3d 668, 674 (7th Cir.2008). These areas are known as the "Paragraph B criteria." *See Craft,* 539 F.3d at 674 (citing 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00 *et seq.* ). The first three functional areas are rated on a five-point scale: none, mild, moderate, marked, and extreme. § 404.1520a(c)(4). The final area is rated on a four-point scale: none, one or two, three, four or more. *Id.*

[4] The original ALJ found that Mr. Moreno's depression was not a severe impairment; the RFC he constructed referred only to Mr. Moreno's physical limitations and did not identify any restrictions related to Mr. Moreno's depression (R. 27-28). The remand order directed the second ALJ to, "reassess, *inter alia* the claimant's mental impairment(s) and the treating physician opinion(s)" (R. 989). In his opinion, the second ALJ explained that this meant he was to further evaluate claimant's mental impairments in accordance with the special technique at 20 CFR 404.1520a and 416.920a, to give further consideration to claimant's RFC, evaluate treating source opinions pursuant to 20 CFR 404.1527 and 416.927 and Social Security Rulings 96-2p and 96-5p and explain the weight given to such opinions, obtain supplemental evidence from a vocational expert if warranted, and offer claimant a new hearing (R. 810-11).

Moreno's initial physical injury resulted from a 2006 fall off a scaffold that was approximately five feet above the ground (R. 336). Mr. Moreno alleges that his pain from the fall has not abated over the years, and instead has worsened and spread, eventually becoming so severe and pervasive that it both prevents him from working and also causes severe depression that contributes to his inability to hold a job (R. 621, 868, 878).

Claimant makes three arguments in favor of remand: (1) the ALJ's RFC determination was flawed because it did not include a limitation for work involving only one-two step tasks and did not account for his moderate restrictions in concentration, persistence and pace; (2) the ALJ erred by failing to submit five years of medical records from claimant's treating psychologist and psychiatrist for consideration by the Agency psychological consultant; and (3) the ALJ failed to consider how the combined effects of claimant's impairments, particularly his obesity, affected his ability to work. Below, we set forth only those facts from the lengthy record that are relevant to our decision.

## A.

With respect to Mr. Moreno's physical pain, the longitudinal medical record (between February 2006 and January 2014) suggests that while Mr. Moreno's pain in his back and extremities may have begun after his fall, his continued discomfort did not necessarily arise from that particular single injury, and persisted long after he recovered from his fall. Moreover, as we describe below, the record shows that after April 2007, Mr. Moreno's medical treatment for his pain was primarily limited to medication management; his prescriptions for pain medication were apparently refilled during visits to several health clinics that were mostly unrelated to his back impairment.

Regarding his back injury in February 2006, Mr. Moreno had an x-ray immediately after the fall that showed no fracture or subluxation and normal bone density (R. 334, 475). A second x-ray taken three weeks later was also normal (R. 357). An EMG performed in June 2006 revealed acute L4 radiculopathy.[5] From the time of his accident until December 2007, Mr. Moreno visited Advocate Christ Medical Center ("Advocate") for treatment of all his medical needs, including a diagnosis of diabetes, management of his high blood pressure, and other acute issues (R. 440-485). He simultaneously received treatment for his pain from orthopedist Richard Lim, M.D., of Midwest Orthopaedic Consultants and underwent physical therapy for the first nine months after his accident; the physical therapy provided slow and only partial pain relief (R. 372 - 401).

Although Mr. Moreno continued to complain of back pain during the first year after the accident, his doctors often could not identify a consistent source of his discomfort (R. 375-77, 405). For example, in December 2006, ten months after his injury, Mr. Moreno still complained of back pain even though Dr. Lim noted that all diagnostic testing "failed to reveal a source of his problems" (R. 376). Instead, Dr. Lim concluded claimant's pain was myofascial in nature (R. 379, 381).[6] In April 2007, Dr. Lim noted that, based on diagnostic testing, including several MRIs and another EMG, Mr. Moreno was not a candidate for surgery (R. 377, 386, 395, 397).[7] Instead, Dr. Lim referred Mr. Moreno to a psychologist for chronic pain management and a pain

---

[5] An EMG is a "diagnostic procedure to assess the health of muscles and the nerve cells that control them." *www.mayoclinic.org/tests-procedures/emg/basics/definition/prc-20014183* Acute L4 radiculopathy refers to lower back pain caused by compression, inflammation and/or injury to a spinal nerve root. https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Low-Back-Pain-Fact-Sheet (both visited on January 25, 2017).

[6] Myofacial pain is chronic pain, often caused by pressure on sensitive points in the muscles that trigger pain in seemingly unrelated parts of the body. http://www.mayoclinic.org/diseases-conditions/myofascial-pain-syndrome/basics/definition/con-20033195 (visited on January 25, 2017).

[7] By April 2007, Mr. Moreno's MRI and EMG were essentially normal; his MRI revealed only mild degenerative changes and the EMG revealed no evidence of lumbosacral radiculopathy (R. 386, 395).

4

doctor for a possible epidural injection (*Id.*). Mr. Moreno had a nerve block injection performed by a pain specialist in April 2007 (R. 490). As described below, he also began seeing therapist Enrique Gonzalez, Ph.D, and psychiatrist Walter Pedemonte, M.D., for mental health treatment related to his chronic pain.

After April 2007, Mr. Moreno's physical pain was treated primarily with narcotics and other prescription and over-the-counter medication (R. 381, 440, 447-49, 566). Claimant's complaints of pain continued, but later examinations continued to find no specific cause and he did not display functional limitations. For example, at a consultative examination in February 2008 in connection with Mr. Moreno's claim for benefits, Liana Palocci, D.O., noted that Mr. Moreno had normal range of motion in his cervical spine, knees, ankles and hips. He had a somewhat limited range of motion in his lumbar spine but no tenderness, and was able to squat and walk heel-to-toe (R. 536-37). Hilda Martin, M.D., the medical expert who testified at Mr. Moreno's second hearing, concurred that Mr. Moreno's spine injury was likely not the cause of his ongoing pain, because he was able to squat and walk heel to toe, which would be unlikely with a back injury (R. 906). Dr. Martin also testified that when she has a patient like Mr. Moreno, who complains of pain everywhere, she asks about depression (R. 905).

Mr. Moreno continued to receive medical treatment from Advocate Christ Medical Center between February 2008 and June 2012 (R. 1144-1267, 1666-1885).[8] Notes from these appointments list up to nineteen different medications Mr. Moreno was prescribed for various physical and mental health issues (R. 1147). He visited Advocate for a variety of reasons: management of his diabetes, Bell's Palsy, pancreatitis, chest pain assessed to be caused by

---

[8] The medical record contains more than 1000 pages of treatment and appointment notes from Advocate, including what appear to be notes from visits to various clinics for management of his diabetes, requests for medication refills, general and follow up appointments with a primary care doctor, treatment for acute issues such as pancreatitis, and other similar issues. From the records, it appears that Mr. Moreno was simultaneously receiving medical care from a number of different doctors and clinics at Advocate.

5

hyperventilation, eye pain, and medication refills; notes also mention chronic back pain and his treatment for depression (R. 743, 1150, 1152, 1212-14, 1668, 1701). Despite the existence of notes mentioning Mr. Moreno's back pain and pain medications, there is no evidence that he underwent diagnostic testing or had medical treatment for his back pain beyond that described above during the first year after his accident.

In 2009 and 2010, Mr. Moreno also visited Lawndale Christian Health Clinic for management of his various physical issues, particularly his diabetes and high blood pressure; during these visits, Mr. Moreno also discussed his treatment for depression and sometimes obtained medication refills for his back pain (R. 564-631). A medical note from Advocate in November 2010, states that claimant's wife informed the clinic that he was "no longer being followed by Lawndale Christian Center" (R. 1203).

With respect to his mental health impairments, claimant began seeing Dr. Gonzalez in April 2007, because Dr. Lim felt that there was nothing else he could do physically for Mr. Moreno (R. 375, 633). Mr. Moreno saw Dr. Gonzalez between one and four times each month beginning in April 2007 and continuing until at least June 2013 (R. 633-726, 2039). Initially, Dr. Gonzalez diagnosed Mr. Moreno with "adjustment disorder with depressed mood [and] pain disorder associated with psychological factors" (R. 633). Two months later, in June 2007, Mr. Moreno had an initial consultation with Dr. Pedemonte who prescribed anti-depressants and other psychiatric medications (R. 642, 756). From March 2008 until the end of 2013, Mr. Moreno saw Dr. Pedemonte once a month for medication management (R. 1927–1943, 2045). At the March 2008 appointment, Dr. Pedemonte diagnosed Mr. Moreno with "severe depression secondary to accident" (R. 1928).[9]

---

[9] The record contains no evidence that Mr. Moreno saw Dr. Pedemonte between his June 2007 assessment and his appointment in March 2008.

Dr. Gonzalez's treatment notes reflect that initially, Mr. Moreno was unaware of the relationship between his chronic pain and the fact that he was feeling depressed, but that he eventually began to realize the connection (R. 635, 710). Notes from throughout the treatment period show that Mr. Moreno's mood fluctuated but that he reported feeling better after his therapy sessions (640). On several occasions, Mr. Moreno told Dr. Gonzalez that keeping busy and maintaining a schedule and routine helped him manage his depression and improve his outlook (R. 638, 649, 657, 676, 1197, 1980, 2000). Specifically, Dr. Gonzalez's notes show that at different times throughout the claims period, Mr. Moreno was able to care for his daughter while his wife was at work, walk his daughter to school, prepare meals for his wife, and generally establish a routine and calendar of activities (*Id.*). While Mr. Moreno also complained about feelings of hopelessness and lethargy, these symptoms tended to ease whenever he was able to establish and maintain a routine, set and follow through with short-term goals, and engage in regular sleep (*Id.*, 2001).

Dr. Pedemonte's notes from his appointments with Mr. Moreno all follow the same, single paragraph format, which includes sections for clinical summary, current mental status, medication and side effects, and prognosis (R. 756-61, 780-89). These short forms are nearly identical from month to month with respect to diagnosis (severe depression), mental status,[10] and prognosis (fair) (R. 756-61). Although the "clinical summary" sections from month to month are nearly identical in diagnosing severe depression, the clinical summary notes from August, October, and November 2008 also state that "patient is showing some degree of improvement"

---

[10] With few differences, Dr. Pedermonte consistently describes Mr. Moreno's "current mental status" as "Appearance: fair, Behavior: WNL [within normal limits], Oriented to Time, Place and Person, Psychomotorly retarded, Suicidal ideation not present, Homicidal ideation not present, Impulse Control fair, No Assaultive behavior present, Hallucination not present, Delusions not present, Illusions not present, Thought disorder not present, Mood Depressed, Affect anxious (sic, in every note), Memory Immediate poor, Recent poor, Remote fair, Attention poor, Concentration poor, Intelligence WNL, Insight moderate, Judgment moderate" (R.756-761).

(R. 775-76). In December 2008, the clinical summary states that "[t]he patient is responding well to medication. The patient is not (sic) longer depressed. The patient is in a better mood, not (sic) longer anxious pt is currently unable to sleep" (R. 776). The "current mental status" portion of this note remains identical to earlier ones, assessing Mr. Moreno with, *inter alia*, anxious affect, and a fair prognosis (*Id.*).

In October 2009, Dr. Pedemonte completed a mental health RFC for Mr. Moreno that diagnosed him with depression and assessed him as having a "moderately poor" prognosis, a GAF of 40,[11] and a number of signs and symptoms of depression, identified via check boxes (R. 780-81).[12] Dr. Pedemonte also opined (via check boxes) that Mr. Moreno had "no useful ability to function" in all sixteen listed "mental abilities and aptitudes needed to do unskilled work" (*Id.*). When asked on the form to explain the limitations falling within the three most limited categories, Dr. Pedemonte did not respond (*Id.*).

After the October 2009 RFC, Dr. Pedemonte's monthly treatment notes about claimant continue to repeat the same information for his current mental state and continue to assess claimant's prognosis as "fair" (R. 1932-33). In these notes, Dr. Pedemonte's "clinical summary"

---

[11] GAF, or global assessment of functioning, is The Global Assessment of Functioning ("GAF") is a system used to score the severity of psychiatric illness, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3036670/ (last visited on September 14, 2016). A score of 40 represents "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." http://www.albany.edu/counseling_center/docs/GAF.pdf (visited on February 8, 2017). We note that the fifth edition of the DSM, published in 2013, has abandoned the GAF scale because of "its conceptual lack of clarity ... and questionable psychometrics in routine practice." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed.2013). *See Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (recognizing the discontinuation of use of the GAF scale after 2012).

[12] The symptoms Dr. Pedemonte identified were pervasive loss of interest in almost all activities, appetite disturbance, decreased energy, thoughts of suicide, blunt or flat affect, feelings of guilt or worthlessness, mood disturbance, difficulty thinking or concentrating, psychomotor retardation, persistent disturbance of mood, paranoid thinking, emotional withdrawal or isolation, easy distractibility, memory impairment, sleep disturbance, and recurrent severe panic attacks (R. 781).

repeats itself for 4-5 months and then changes to use different language to describe claimant's depression for another 4-5 months before changing again (R. 1930-37).[13]

Although treatment notes from Dr. Gonzalez reflect that Mr. Moreno had ups and downs in his mood and occasional suicidal ideations, his fluctuations never led any medical professional to opine that he needed hospitalization or more intense treatment beyond weekly therapy sessions (R. 645, 661-62, 715). Claimant also told Dr. Gonzalez that he sometimes had problems with memory and was trying to make changes at home to improve his forgetfulness (R. 659, 683, 713). At many of his appointments in 2007 and 2008, he reported having low back pain, although he also reported improvement in his pain at times (R. 635 – 680, 686, 721).

Mr. Moreno also underwent several psychiatric consultative examinations with respect to his claim for benefits. First, in August 2007, Mr. Moreno underwent a psychiatric examination by Herman Langner, M.D., for the bureau of disability determination services (R. 405). Dr. Langner diagnosed claimant with depression – not otherwise specified, and a GAF for 45-50 (R. 407). He noted in his report of the examination that Mr. Moreno had some trouble with immediate memory, but that it may have been the result of language difficulties (R. 406). In September 2007, Margaret Wharton, Psy.D, completed a mental health RFC based on Dr. Langner's examination. She found Mr. Moreno to have mild limitations in his ability to perform activities of daily living and to maintain social functioning, and moderate difficulties with concentration, persistence and pace (R. 418). Specifically, Dr. Wharton checked boxes that assessed Mr. Moreno as having moderate limitation in the ability to understand and remember

---

[13] For example, seven monthly clinical summaries from January 3, 2009 to July 25, 2009 all state "[t]he Pt hurt his back again and he had a bad Christmas and New Year. The patient continues having a severe back pain" (R. 1930-32). The next six clinical summaries from appointments between September 19, 2009 and April 3, 2010 all state that "[t]he insurance does not want to pay his medications. Pt. continues with severe pain and severe depression and feelings of hopelessness" (R. 1932-1934).

detailed instruction, the ability to carry out detailed instruction, and the ability to maintain attention and concentration for extended periods (R. 419). She assessed Mr. Moreno as being "not significantly limited" in his ability to perform all other listed activities concerned with understanding and memory[14] and sustained concentration and persistence.[15] In her written notes, Dr. Wharton stated, *inter alia*, that Mr. Moreno's "cognitive and attentional skills are intact and adequate for simple one-two step work tasks" (R. 424).

In February 2008, Mr. Moreno underwent another psychiatric evaluation by DDS, this time by Michael Stempniak, Ph.D. Dr. Stempniak diagnosed Mr. Moreno with major depressive disorder and noted that he appeared to be of low average intelligence and had some difficulty with memory and concentration when asked to repeat digits and do basic math problems (R. 540, 542). Based on this examination, Commission psychologist Tyrone Hollerauer, PsyD, completed a psychiatric review of Mr. Moreno, assessing him as not having a severe impairment (R. 542). Dr. Hollerauer diagnosed Mr. Moreno with "Major Depression 'mild' in severity" (R. 545). With respect to the "Paragraph B" criteria, Dr. Hollerauer checked the boxes that assessed Mr. Moreno as having "mild" limitations with all three criteria – activities of daily living, social functioning, and concentration, persistence and pace" (R. 552).

In October 2009, Mr. Moreno visited Lawndale Christian Health Center and met with Michael Hansen, Psy.D, because he was having suicidal thoughts (R. 621). This visit did not

---

[14] These activities are the ability to remember locations and work-like procedures and the ability to understand and remember very short and simple instructions (R. 422).

[15] These activities are (1) the ability to carry out very short and simple instructions; (2) the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (3) the ability to sustain an ordinary routine without special supervision; (4) the ability to work in coordination with or proximity to others without being distracted by them; (5) the ability to make simple work-related decisions; and (6) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (R. 422).

result in a hospital admission; instead, Mr. Moreno agreed to implement daily activities and behaviors he enjoyed, to track his mood, and to work on relaxation exercises (R. 622).

## III.

In his opinion dated June 17, 2014, the ALJ followed the familiar five-step process for determining disability, 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a). The ALJ found that Mr. Moreno had the following severe impairments: lumbar disc disease, myofascial pain syndrome, left knee pain, obesity, and depression, but that none of them met or equaled a listing (R. 813-14). The ALJ found that Mr. Moreno's hypertension and diabetes were not severe, explaining that the record shows that both conditions are well managed with medication when Mr. Moreno was compliant, and that the single visit Mr. Moreno had to the hospital for chest pain was determined to be related to hyperventilation and anxiety (*Id.*). Similarly, Mr. Moreno's acute attacks of pancreatitis and vertigo were not ongoing and had not resulted in any functional limitations, so they were also non-severe (*Id.*).

With respect to the special technique for evaluating the severity of Mr. Moreno's mental health impairment, the ALJ first found that Mr. Moreno had mild restrictions in his activities of daily living, because claimant's pain psychologist (Dr. Gonzalez) found that Mr. Moreno experienced improvements in his mood and energy when he was able to set a regular schedule of activities, that he was able to take his daughter to daycare, perform household chores (particularly when they were part of a daily schedule), and that he could use public transportation (R. 814). The ALJ next found that Mr. Moreno had moderate limitations in social functioning because he testified about panic attacks and anxiety around crowds; the ALJ found that otherwise, Mr. Moreno's social functioning was "only mildly limited" because he could attend

11

less crowded church services, he built rapport with his doctors, and he had a number of friends who submitted third party statements in support of his application for benefits (R. 814-15).

The ALJ also found that Mr. Moreno had moderate limitations in concentration, persistence and pace, as documented in treatment notes from Drs. Gonzalez and Pedemonte that showed "some difficulty with concentration, attention and memory, but records also show the Mr. Moreno was engaged during sessions and able to maintain conversation/discussion and participate appropriately in his course of treatment" (R. 815). The ALJ also noted that that Dr. Gonzalez indicated that a lack of structure could be responsible for claimant's mental health symptoms with respect to his concentration, persistence and pace, and that they improved with regular scheduling and increased activity (*Id.*).

The ALJ then set Mr. Moreno's RFC as the ability to perform light work as defined at 20 C.F.R. 404.1567(b) and 416.967(b). The ALJ added a number of physical functional limitations including: only occasional use of left foot controls, occasional balancing, stooping, kneeling, crouching, crawling and climbing ramps and stairs, no climbing on ladders, ropes or scaffolds, no concentrated exposure to temperature extremes or unprotected heights (R. 816). The ALJ also restricted Mr. Moreno's mental health abilities to jobs that included understanding, remembering and carrying out simple work instructions and exercising simple workplace judgments (*Id.*). The RFC went on to stay that Mr. Moreno was capable of "routine, low stress work, defined as work involving only occasional changes in the work setting and occasional decision-making," as well as occasional interactions with the public (*Id.*). The ALJ's explanations and justifications for his RFC are lengthy; we describe them below as relevant when addressing Mr. Moreno's arguments for remand.

## IV.

The Social Security Act, 42 U.S.C. § 405(g), requires us to uphold the findings of the Commissioner if they are supported by substantial evidence. *Ghiselli v. Colvin*, 837 F.3d 771 (7th Cir. 2016). Therefore, we will reverse the Commissioner's findings only if they are not supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In doing so, we may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue,* 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). Instead, we must look to whether the ALJ built an "accurate and logical bridge" from the evidence to his conclusion that the claimant is not disabled. *Curvin v. Colvin,* 778 F.3d 645, 648 (7th Cir. 2015).

An ALJ's decision should be read as a whole, and therefore, the ALJ need not repeat the same information in multiple parts of the decision. *See, Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004) ("[I]t is proper to read the ALJ's decision as a whole, and...it would be a needless formality to have the ALJ repeat substantially similar factual analyses at [multiple] steps"). Moreover, an ALJ need not discuss every individual piece of evidence as long as he adequately justifies his conclusions. *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). That is, we will affirm if the ALJ adequately supports his conclusions even if "reasonable minds could differ concerning whether [Moreno] is disabled." *Elder v. Astrue,* 529 F.3d 408, 413 (7th Cir. 2008). Here, we find that the ALJ did provide a "logical bridge" from the evidence to his conclusions that Mr. Moreno retained the ability to perform work, and thus we affirm his decision.

**A.**

Mr. Moreno's first argument is that the ALJ's assessment of his RFC is flawed because (1) it did not account for the recommendation of Dr. Wharton that claimant is only capable of performing one-two step jobs, and (2) it did not fully account for Mr. Moreno's limitations in concentration, persistence and pace. We disagree, and find that the ALJ adequately supported his determination of Mr. Moreno's RFC.

With respect to the first part of his argument, Mr. Moreno contends that because the ALJ gave great weight to Dr. Wharton's opinion, the ALJ's RFC assessment should have included Dr. Wharton's finding that Mr. Moreno remained capable of performing one-two step tasks. However, we have found no law that requires an ALJ to adopt a doctor's RFC opinion in its entirety – even when the ALJ gives that opinion great weight.[16] Instead, an ALJ must build a logical bridge from the evidence to his decision. In this case, the ALJ does fully explain and justify his decision to assign Mr. Moreno an RFC limited to jobs requiring him to understand, remember, and carry out simple work instructions and exercise simple workplace judgments. The ALJ considered not just Dr. Wharton's RFC, but also Mr. Moreno's testimony, the treatment notes and opinions of his treating doctors, the opinions of the other consultative doctors who examined Mr. Moreno,[17] as well as other evidence supporting his RFC decision.

---

[16] Claimant cites to the SSR 96-6p, which prohibits ALJs from ignoring the opinions of state agency psychological consultants and requires them to explain the weight given to such opinions in their decisions (Mot. for Sum. J. at 11). But the ALJ did not ignore Dr. Wharton's assessment and he did assign it a specific weight, so this argument by claimant has no merit.

[17] The ALJ specifically rejected the opinion of agency psychological consultant, Tyrone Hollerauer, who found in March 2008 that Mr. Moreno's mental health impairments did not constitute severe impairments. Specifically, the ALJ found that Mr. Moreno's regular history of behavioral therapy and psychiatric medication management throughout the claims period with continued complaints of pain and depression suggests a severe impairment (R. 831).

For example, when describing his analysis of the "Paragraph B" criteria, the ALJ discussed both Dr. Gonzalez's notes and Mr. Moreno's own testimony that he was able to perform a number of daily activities that involve following simple instructions and decision making, such as household chores, following a schedule, maintaining a routine of taking care of his daughter during the day, and making construction-related decisions about his home's damaged roof (R. 814-15).[18]

The ALJ also explained that throughout the course of his mental health treatment, Mr. Moreno's depression tended to improve whenever he maintained a schedule of activities and engaged in household chores, childcare, and decision-making about his home. The ALJ relied on Dr. Gonzalez's notes which, while recognizing that claimant's mood did fluctuate, opined that structure and scheduled activities improved Mr. Moreno's symptoms (R. 828, 833). Indeed, the ALJ specifically notes that "Dr. Gonzalez's treatment notes strongly suggest that more activity, not less or no activity . . . improves the claimant's mood, energy, motivation and sleep and that lack of structure exacerbates the claimant's symptomology" (R. 834). We find that the ALJ more than adequately explained why his RFC limiting Mr. Moreno to simple, routine, low stress work was supported by the medical evidence, and that he did not err by not including a one-two step limitation contained in Dr. Wharton's report. *See, e.g., Pepper v. Colvin,* 712 F.3d 351, 366-67 (7th Cir. 2013) (ALJ's detailed description of the medical evidence and conclusion that it supported a light work RFC was not error even though ALJ did not strictly adhere to the "special technique" because court could follow ALJ's reasoning).

---

[18] We recognize that a claimant's ability to perform various activities of daily living does not, in itself, suggest an ability to perform full time work. *Hamilton v. Colvin,* 525 Fed.App'x 433, 438 (7th Cir. 2013). But in this case, the ALJ did not extrapolate an ability to work full time from the fact that Mr. Moreno was able to perform a number of activities at home. Instead, the ALJ explains that the very act of performing these activities actually improved Mr. Moreno's mental health symptoms, which in turn suggested an ability to work.

We recognize that the ALJ's RFC determination conflicts with the RFC opinions by Dr. Pedemonte, who opined in 2009 and 2011 that Mr. Moreno was almost totally debilitated by his depression and unable to perform even the most basic activities at home or work. An ALJ must give controlling weight to a treating physician's opinion if the opinion is both supported by "medically acceptable clinical and laboratory diagnostic techniques," and is "not inconsistent" with substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2). When an ALJ decides to give a treating physician less than controlling weight, he or she must consider six criteria in deciding how much weight to afford a medical opinion: (1) the nature and duration of the examining relationship, (2) the length and extent of the treatment relationship, (3) the extent to which medical evidence supports the opinion, (4) the degree to which the opinion is consistent with the entire record, (5) the doctor's specialization, if applicable, and (6) other factors which validate or contradict the opinion. 20 C.F.R. § 404.1527(d)(2)-(d)(6). If the ALJ decides not to give controlling weight to a treater's opinion, he or she must use these factors to minimally articulate sound reasons for that decision. *Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir. 2007), 20 C.F.R. § 404.1527(c). We find that the ALJ sufficiently explained his reasons for rejecting Dr. Pedemonte's RFC opinions.[19]

In his decision, the ALJ provides a thorough and detailed explanation of how Dr. Pedemonte's opinions are inconsistent with his own treatment notes and Dr. Gonzalez's contemporaneous treatment notes, both of which consistently suggest that Mr. Moreno has many fewer limitations and a better prognosis (R. 833). In his explanation, the ALJ discussed each of the six criteria in the course of his in-depth review of Dr. Pedemonte's treatment of Mr. Moreno over the course of six years, the medications he prescribed, and the ways in which Dr.

---

[19] Notably, claimant does not argue that the ALJ failed to adhere to the treating doctor rule by considering and then rejecting Dr. Pedemonte's RFC opinions. That argument, if made, would have failed in any event because of the detailed and reasonable explanation the ALJ provided for his treatment of Dr. Pedemonte's RFC opinions.

Pedemonte's opinions conflicted with his treatment notes. For example, the ALJ noted that Dr. Pedemonte's October 2009 RFC opinion diagnoses Mr. Moreno with bi-polar disorder, even though this diagnosis does not appear in a single treatment note between 2009 and 2013 (R. 832). The ALJ also discredited Dr. Pedemonte's 2009 RFC, noting that it stated that Mr. Moreno had experienced a number of medication side effects despite the fact that all of Dr. Pedemonte's treatment notes reflect that Mr. Moreno had no side effects from his medications (*Id.*). Similarly, the ALJ rejected Dr. Pedemonte's assessment that Mr. Moreno has a "poor" prognosis because all of his treatment notes assessed Mr. Moreno's prognosis as "fair" (*Id.*). With respect to Dr. Pedemonte's opinion that Mr. Moreno had no useful ability to function or perform unskilled work with respect to sixteen specific mental abilities and aptitudes, the ALJ noted that these assessments were not borne out by any of his treatment notes, which report much less severe symptoms, assess normal behavior, and recognize Mr. Moreno's ability to maintain normal cleanliness standards and his moderate insight (*Id.*).[20]

In addition to describing the conflicts between Dr. Pedemonte's RFC and his treatment notes, the ALJ casted doubt on the quality of Dr. Pedemonte's notes themselves. The ALJ pointed out that sections of the notes, including the clinical summary, mental status exam findings, diagnosis, and even prescribed medications, appeared to be cut and pasted from month to month and are in conflict with other parts of the treatment notes (R. 829-31). For example, the ALJ points out that while Dr. Pedemonte's December 2008 clinical summary states in part that Mr. Moreno is no longer depressed, this clinical summary, as well as those from every month

---

[20] The ALJ rejected Dr. Pedemont's 2011 RFC opinion for similar reasons as he rejected the 2009 opinion, namely, that it assessed Mr. Moreno as having no functional ability to work across these sixteen different criteria despite medical records from 2009 to 2013 that assessed Mr. Moreno as having much less severe impairments and symptoms (R. 833).

between March and December 2008 diagnose Mr. Moreno with severe depression (R. 829). In sum, we find that the ALJ fully justified his decision to reject Dr. Pedemonte's medical opinions.

## B.

Claimant also attacks the ALJ's RFC by arguing that it does not adequately account for his assessment that Mr. Moreno has moderate limitations in concentration, persistence and pace. It is well-settled that an ALJ's RFC assessment and the hypothetical posed to the VE must incorporate all of the claimant's limitations supported by the medical record. *Yurt v. Colvin,* 758 F.3d 850, 857 (7th Cir.2014). Mr. Moreno relies on *O'Connor-Spinner v. Astrue,* 627 F.3d 614, 620 (7th Cir. 2010), for the proposition that a hypothetical that uses only terms such as "simple, repetitive tasks" does not adequately put the VE on notice that the claimant has limitations in concentration, persistence and pace, and that therefore, the ALJ's hypothetical erroneously failed to inform the VE of the totality of Mr. Moreno's limitations.

The *O'Connor-Spinner* court found that, without more, a hypothetical limiting a claimant to unskilled work and involving repetitive tasks with simple instructions did not adequately account for the claimant's demonstrated depression-related problems with concentration, persistence and pace. 627 F.3d at 620. However, the appeals court also held that a hypothetical need not include the specific words "concentration, persistence and pace," if other evidence showed that the VE was adequately apprised of the claimant's limitations through independent review of the medical record or from hearing testimony, or where the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's particular limitations would be unable to perform. *Id.* In this case, we are satisfied that the second exception applies: that the ALJ's hypothetical to the VE adequately addressed Mr. Moreno's specific deficiencies in concentration, persistence, and pace, as established in the medical record.

At the hearing, the ALJ asked the VE to assume an individual who can "understand, remember, and carry out simple work instructions . . . and exercise simple workplace judgements. And further, the individual would be limited to routine work . . . defined as no more decision making, no more than occasional changes in the work setting" (R. 921-22). After setting this hypothetical (along with a number of physical limitations as well), the ALJ asked the VE if there were jobs Mr. Moreno could perform, assuming he could sustain work over the course of a seven or eight hour work day (R. 922). This hypothetical addressed Mr. Moreno's specific limitations in concentration, persistence and pace that the ALJ found supported by the medical record, as well as by Dr. Wharton's RFC assessment.

*First*, in analyzing the concentration, persistence and pace category of the Paragraph B criteria, the ALJ noted that, according to treatment notes from Drs. Gonzalez and Pedemonte, Mr. Moreno did have some difficulty with concentration, attention, and memory, but that such deficiencies were not so severe as to preclude claimant's ability to maintain a conversation or participate in his treatment (R. 815). Moreover, in discussing claimant's concentration, persistence, and pace, the ALJ specifically refers to Dr. Gonzalez's consistent opinion throughout the treatment period that a lack of structure may be responsible for Mr. Moreno's deficiencies in this area, and that increasing activity and keeping a schedule resulted in an improvement in Mr. Moreno's energy, mood, motivation, and sleep patterns.

*Second*, in the RFC form she completed, Dr. Wharton assessed Mr. Moreno as moderately limited in only two activities under the "sustained concentration and persistence" category – the ability to carry out detailed instructions and the ability to maintain attention and concentration for extended periods (R. 422). Significantly, Dr. Wharton found that Mr. Moreno was not significantly limited in the remaining six criteria in this category, including his ability to

19

complete a normal workday and workweek and to perform at a consistent pace without an unreasonable number and length of rest periods.[21]

Considering the totality of the ALJ's reasoning, we are satisfied that the ALJ's hypothetical to the VE adequately accounted for Mr. Moreno's specific limitations with respect to how his depression caused by chronic pain affected his concentration, persistence and pace. Specifically, the hypothetical accounted for Mr. Moreno's issues with memory, attention, ability to follow detailed instruction and ability to maintain concentration for extended periods, as modified by the fact that these specific limitations improved when Mr. Moreno was able to follow a set, scheduled routine of activities.

In making our finding about Mr. Moreno's specific limitations in concentration, persistence and pace, we are mindful of the Seventh Circuit's decision in *Varga v. Colvin,* 794 F.3d 809, 812-13 (7th Cir. 2015)*,* which held that an ALJ's hypothetical that asked about, *inter alia,* "simple, routine, or repetitive tasks . . . involving only simple work related decisions with few if any work place (sic) changes" did not sufficiently account for claimant's moderate limitations in concentration, persistence, and pace. But the claimant in *Varga* was assessed as having seven (as opposed to Mr. Moreno's two) moderate limitations in an RFC assessment by a non-examining agency consultant, including a moderate limitation on the ability to complete a workday and workweek without interruption. Moreover, in *Varga,* there was no additional medical evidence regarding Ms. Varga's limitations, and the Seventh Circuit found that limiting work to "simple, routine, and repetitive tasks" refers only to the ability to perform unskilled

---

[21] The remaining categories for which Dr. Wharton found Mr. Moreno to be not significantly limited are the ability to carry out very short and simple instructions, the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, the ability to sustain an ordinary routine without special supervision, the ability to work in coordination with or proximity to others without being distracted by them, and the ability to make simple, work-related decisions (R. 422).

work, not to the ability of a claimant with mental illness to maintain concentration, persistence and pace. *Id.*

In contrast, Mr. Moreno's specific limitations with concentration, persistence, and pace were carefully documented and discussed by the ALJ. The ALJ gave the VE a hypothetical that limited Mr. Moreno to having to remember only simple instructions and provided a routine and established work routine, which the evidence showed improved Mr. Moreno's concentration, persistence, and pace. The evidence showed that, despite his depression, Mr. Moreno retained the ability to complete a work day and work week, and that more routine – not less – was likely to alleviate his symptoms in this area. Therefore, we are satisfied that the jobs that the VE testified as being those Mr. Moreno could perform did adequately take into account his specific limitations in concentration, persistence and pace.

## C.

Contrary to claimant's contention, the fact that the ALJ did not obtain an updated mental health consultative opinion, despite five years of subsequent treatment notes by Drs. Gonzalez and Pedemonte that post-dated Dr. Wharton's 2007 RFC, does not warrant a remand. An ALJ is required to obtain another expert opinion only when, "in the opinion of the administrative law judge, 'new evidence might cause the initial opinion to change.'" SSR 96-6p, *Buckhanon ex rel. J.H. v. Astrue,* 368 Fed.App'x. 674, 679 (7th Cir. 2010).

Mr. Moreno relies on *Campbell v. Astrue,* 627 F.3d 299, 309 (7th Cir. 2010), which faults an ALJ for failing to explain why he gave state agency doctors' opinions – which were rendered before the existence of additional treatment records – more weight than the opinion of the treating doctor who created those later records. Claimant also argues the ALJ improperly "played doctor" by substituting his own opinion about how Dr. Wharton might have interpreted the

additional evidence of Mr. Moreno's treatment. *See, Harlin v. Astrue,* 424 F.App'x 564, 567-68 (7th Cir. 2011). Claimant postis that, had Dr. Wharton seen these notes, they may have induced her to find Mr. Moreno more limited, even to the extent of being unable to work (Pl. Mem. in Support of Sum.J. at 15). We disagree.

Unlike in *Harlin,* the ALJ here did not base his RFC on his own opinion of how Dr. Wharton might have interpreted the later medical records. Rather, the ALJ determined that the medical evidence and opinions, in the case of Dr. Gonzalez, support the ALJ's RFC, and in the case of Dr. Pedemonte, were unreliable. In contrast to the ALJ in *Campbell,* our foregoing discussion shows that the ALJ here did in fact explain why he gave Dr. Pedemonte's opinion no weight and why he questioned parts of Dr. Pedmonte's treatment notes, and claimant does not argue that the ALJ's determination on this matter was in error. Moreover, claimant points to no evidence that Dr. Gonzalez's treatment notes from 2008-2013 show a worsening of the symptoms claimant presented at the time of Dr. Wharton's report. To the contrary, the ALJ specifically points to treatment notes from 2008 to 2013 showing that although Mr. Moreno continued to experience ups and downs with his depression and complaints of pain, much as he had throughout the treatment period, his overall disposition was improved because he was following a schedule and engaging in regular activities (R. 827). Thus, we find that the ALJ did not err by not obtaining an updated mental health consultative opinion.

### D.

Finally, we find that the ALJ adequately considered the combined effects of Mr. Moreno's physical impairments, mental health impairments, and obesity when determining his RFC. In determining Mr. Moreno's RFC, the ALJ accounted for the "claimant's pain/somatic component of his mental impairment" (R. 826). And, throughout his decision, the ALJ discussed

Mr. Moreno's treatment for both his physical and mental impairments, and how one affected the other: in particular, he noted several times Dr. Gonzalez's finding of a strong relationship between Mr. Moreno's pain and his depression (R. 820, 823, 828).

Consistent with these observations by the ALJ, the RFC determination specifically accounted for the relationship between Mr. Moreno's depression and his pain. The ALJ explained that Dr. Gonzalez found that increased activity and adherence to a schedule helped Mr. Moreno's mood and energy, and that an improved mood and energy helped Mr. Moreno better cope with his pain. Despite finding that none of claimant's treating doctors opined that Mr. Moreno was disabled because of his physical issues or that he had any physical limitations in his ability to work, the ALJ assigned Mr. Moreno a light work RFC with additional restrictions to account for his complaints of pain (R. 832).

We also disagree with claimant's contention that the ALJ failed to address Mr. Moreno's obesity, either singularly or in combination with his other impairments. When determining whether a claimant is disabled, an ALJ must consider the effects of claimant's obesity, even if he does not allege that it is an impairment. SSR 02-1p. But the cases cited by claimant involve ALJ decisions that omit any discussion of claimant's obesity at all, often in the face of significant physical medical evidence and diagnoses that might be exacerbated by claimant's weight. *See, e.g., Stage v. Colvin,* 812 F.3d 1121, 1125 (7th Cir. 2015) (without discussion, appeals court mentioned ALJ's failure to discuss claimant's obesity in relation to her severe hip impairment as one factor in remand); *Martinez v. Astrue,* 630 F.3d 693, 698-99 (7th Cir. 2011) (remand appropriate for ALJ opinion filled with errors because ALJ only mentioned claimant's obesity "in passing," and not in relation to claimant's severe knee injury).

Here, the ALJ specifically addressed Mr. Moreno's obesity in his opinion, describing the testimony of Dr. Martin that Mr. Moreno's weight fluctuated within the BMI Level I range from 31 to 34 throughout the claims period.[22] In his opinion, the ALJ found that Mr. Moreno's weight did not affect his ability to ambulate effectively as described in Listing 1.00B2b, and did not unduly impair his respiratory or cardiovascular systems (R. 825). While the ALJ agreed that Mr. Moreno's weight likely contributed to his complaints of back and knee pain, and noted that he used a cane to walk at times, there was no evidence that claimant's obesity precluded all work activity (R. 826). The ALJ also noted that the medical record as a whole contained little evidence or information pertaining specifically to Mr. Moreno's weight, and that throughout the record, claimant's physical examinations generally showed only intermittent complaints of pain but either no or only mild impairments in breathing, heart sounds, and blood pressure (*Id.*).

Although the ALJ did not specifically discuss Mr. Moreno's depression in the section of the opinion concerning Mr. Moreno's obesity, his analysis throughout the opinion shows that the ALJ considered the relationship between claimant's physical and mental health conditions. Claimant himself does not suggest how his obesity may have affected his depression, and none of his treaters discussed his obesity in connection with his mental health. Given the minimal discussion in the medical record about Mr. Moreno's obesity or how it affected his ability to function at all, we do not find the ALJ erred in his treatment of Mr. Moreno's obesity as it affected his depression. *See, Prochaska v. Barnhart,* 454 F.3d 731, 737 (7th Cir. 2006). In *Prochaska,* the ALJ (unlike the ALJ here) never specifically addressed claimant's obesity in his

---

[22] BMI, or body-mass index, is a person's weight divided by height. It is not a direct measure of a person's body fat, but describes a correlation with more direct measures of body fat and also has a strong correlation with various metabolic and disease outcomes. BMI measurements are divided into four basic categories: underweight, normal weight, overweight, and obese. https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/ (visited on February 15, 2017). Within the category of obesity, there are three levels. https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmi_dis.htm (visited on February 15, 2017). Mr. Moreno's BMI fluctuated within the lowest obesity level, between 30 and 34.9 (R. 825).

opinion, but the Seventh Circuit found the error to be harmless because the ALJ "predicated his decision upon the opinions of physicians who did discuss her weight." *Id.* In *Prochaska*, there were no medical opinions in the record that identified claimant's obesity as contributing to her limitations and claimant herself failed to explain how her obesity further impaired her ability to work. *Id.* Likewise, in this case, none of Mr. Moreno's doctors discussed his obesity, particularly as it related to his depression, and claimant himself identifies no additional limitations he experienced because of the combined effects of his weight and his other impairments. We find no error in the ALJ's treatment and consideration of Mr. Moreno's obesity.[23]

## CONCLUSION

For the foregoing reasons, the Commissioner's motion for summary judgment (doc. # 23) is granted and Plaintiff's motion for summary judgment (doc. # 16) is denied. The case is terminated.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATE: March 6, 2017**

---

[23] We also note that Mr. Moreno underwent a consultative examination in 2008 by Young-Ja Kim, M.D., who assigned limitations that matched the ALJ's RFC determination (R. 556-63). The ALJ also relied heavily on the testimony of Dr. Martin, who reviewed the medical record, listened to Mr. Moreno's testimony, and then testified at the hearing about claimant's physical abilities and the lack of a definitive etiology for claimant's pain (R. 835-37).